UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JULIUS SMITH,                           )
                                        )
                Petitioner,             )
                                        )
        v.                              )        Case No. 4:14CV01922 AGF
                                        )
MICHAEL BOWERSOX,                       )
                                        )
                Respondent.             )

## MEMORANDUM AND ORDER

This matter is before the Court on the pro se petition of Missouri state prisoner

Julius Smith for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On September 15,

2009, Petitioner was convicted by a jury of first-degree murder and armed criminal action

for the November 8, 2007 shooting death of Jonathan Walker. Petitioner was sentenced

to life without parole on the murder charge, and a concurrent sentence of five years'

imprisonment for armed criminal action. His convictions and sentences were affirmed on

direct appeal. Petitioner's motion for state post-conviction relief was denied following an

evidentiary hearing, and this denial was affirmed on appeal.

Petitioner raises eight claims for habeas relief: (1) the trial court abused its

discretion in admitting the testimony of an investigator (Michael Graves) for the

prosecution and a police officer (James Stagge) regarding gang activity in the area of the

crimes; (2) the trial court erred in admitting photo exhibits showing gang graffiti in the

area; (3) the trial court erred in admitting the testimony of one of the two eye witnesses

(Corey McCanery) who testified that he had known Petitioner for approximately seven

years, and also testified that Petitioner had shot him in June 2007, a crime for which Petitioner was never charged, and which, according to Petitioner, he did not commit; (4) defense counsel was ineffective in failing to call two individuals (Kesha Johnson and Gloria Johnson) as alibi witnesses; (5) defense counsel was ineffective in failing to ask Petitioner at trial where he was at the time of the murder; (6) defense counsel was ineffective in failing to introduce evidence showing that Petitioner was not the shooter in the June 2007 incident (namely, photographic evidence that in June 2007, he did not have dreadlocks), thereby undermining the credibility of McCanery's identification of Petitioner as Walker's murderer; (7) defense counsel was ineffective in failing to request clarification as to what evidence the jury asked to see during deliberations; and (8) defense counsel was ineffective in failing to request a mistrial after the jury indicated it was at an impasse and before the trial court gave a "hammer" instruction.

Respondent argues that Petitioner's last claim was procedurally defaulted, and that the state courts' adjudication of the remaining claims was factually and legally reasonable. For the reasons set forth below, federal habeas relief will be denied.

**BACKGROUND**

**Trial**

During voir dire, both the State and Petitioner told the venire panel that there would be evidence that the victim and Petitioner were associated with criminal street gangs. Venirepersons who indicated a tendency to presume guilt based on Petitioner's association with a gang were struck for cause. McCanery, who was 18 years old at the time of trial, testified that on November 8, 2007, at approximately 6:30 p.m., he was

walking on the 4900 block of Aldine Place in the City of St. Louis when he encountered two friends, Donovan Wilson and Walker. As McCanery was talking to Wilson and Walker, a car drove down the street and stopped a short distance from the three young men. McCanery testified that Petitioner was driving the car and an individual named Edward Hughes was also in the car; that Petitioner started firing at the three men with a semi-automatic handgun; that McCanery dropped to the ground and hid behind a car; that as Wilson and Walker attempted to run away, they were both shot; that Petitioner fired a final shot to where McCanery was hiding, and drove away. McCanery testified that he ran toward Walker, saw that he was bleeding, and called the police.

McCanery testified further that approximately three hours later, during an interview at the police station, he told the police that he saw the shooting from a distance, that he was sure the person in the passenger seat of the car was Hughes, but that he was not sure that the driver – the person who fired the shots – was Petitioner. These statements were recorded and the recording was played for the jury and admitted into evidence.[1] McCanery testified at trial that he made these statements to the police because he was nervous and shaken up. ECF No. 9-1 at 44-45, 50-51.

McCanery testified that he had known Petitioner for about seven years before the murder, and that Petitioner had previously shot him on June 11, 2007. McCanery testified that in June 2007, Petitioner had dreadlocks, whereas at the time of the

---

[1] The recording has not been made a part of the record in this habeas case, but the parties do not dispute its contents, *i.e*., what McCanery told the police during his interview on November 8, 2007.

3

November 8, 2007 shooting he had a "low haircut," which was one of the reasons McCanery initially told police he was not sure the driver of the car was Petitioner.

McCanery testified that a "couple of months" after the November 8, 2007 shooting, he identified Petitioner to the police from a photo lineup as the person who killed Walker. He also identified Petitioner in the courtroom as the murderer. On cross-examination, defense counsel brought out the inconsistencies between McCanery's initial videoed statements to the police and his trial testimony, as well as inconsistencies between his trial testimony and a deposition defense counsel had taken. The deposition was not admitted into evidence.

Wilson testified consistent with McCanery, except that Wilson testified that he did not see who the men in the car were. He further testified that he never told the police that Petitioner was the shooter. Wilson testified that he was involved in gang life as a "4900 Aldine Blood," and that he was aware that Petitioner (referred to as "JuJu") was a member of a rival "Crips" gang. The State introduced evidence that Walker died at the scene of the shooting from a gunshot wound to the chest.

Graves testified that as an investigator for the Circuit Attorney's Office of the City of St. Louis, he was member of a "gang unit," and that in July 2017, he spoke to Wilson about Walker's murder, and Wilson told him that "JuJu" was the person who shot and killed Walker. *Id*. at 57. Graves also identified six photo exhibits depicting gang graffiti in the neighborhood of the murder taken after the murder. Stagge testified that he had special training and was an expert on criminal gangs. He explained to the jury what a gang is, and testified at some length about gangs' propensities for violence and cycles of

retaliation, and how some of the graffiti shown in the photographs indicated that the two local gangs mentioned earlier were engaged in an ongoing dispute that involved reciprocal killings of members of each gang. There was no physical evidence linking Petitioner to the murder.

Petitioner was the only witness for the defense. The only question, other than his identity, that defense counsel asked him was whether he had killed Walker, to which Petitioner answered, "No, sir." On cross-examination, Petitioner testified that he was not a member of the Crips gang referenced by Wilson, that he did not know McCanery, Wilson, or Walker, and that McCanery and Walker made up their stories about what happened at the shooting.

The first-degree murder charge was submitted to the jury on the theory of transferred intent. The verdict director instructed the jury that if it found that Petitioner caused Walker's death by shooting at McCanery and hitting Walker, that it was Petitioner's purpose to cause McCanery's death, and that Petitioner did so after deliberation, then the jury was to find Petitioner guilty of first-degree murder. In closing argument, defense counsel stressed the lack of any physical evidence against Petitioner, McCanery's changing stories in identifying the shooter, and the State's burden of proof. After the jury was escorted to the jury room, the trial court questioned Petitioner about his satisfaction with defense counsel's performance. Petitioner stated that he did not help counsel in the preparation of his defense in that counsel did not call two individuals Petitioner wanted him to all as alibi witnesses – his girlfriend Kesha Johnson and her mother Gloria Johnson. Defense counsel stated that he had contacted them both but that

as a matter of trial strategy, he decided not to call them, and that he discussed this with Petitioner. Petitioner responded that he did not agree with counsel on the matter and that he told counsel he specifically wanted him to call Gloria Johnson. Petitioner acknowledged that he knew counsel had withdrawn the notice of alibi defense and that he was not going to call alibi witnesses. The discussion ended with the court asking Petitioner if he was happy with counsel's representation of him, and Petitioner responding, "Yes, sir." *Id*. at 95-96.

During deliberations, the jury requested to see "deposition of Corey McCanery," and "transcript of Detective Graves." Defense counsel argued that he believed the jury was confused between the videotape of McCanery's statement to the police (in which McCanery stated that he was not sure that Petitioner was the driver of the car and the shooter) and McCanery's deposition. The trial court did not agree, saying the jury asked for McCanery's deposition, not the videotape of his statements to the police. Counsel made a record that he requested that the videotape be given to the jury; the court denied the request. The court sent an answer to the jury that they could not review McCanery's deposition or Grave's transcript. *Id*. at 96-97.

After deliberating for two hours and 45 minutes, the jury told the trial court that they were at an impasse and the court gave the following "hammer" instruction, over defense counsel's objection:

> I have one more Instruction that that I am going to read to you and then I am going to send you upstairs to continue to deliberate on the case. This will be Instruction number 13.

You should make every reasonable effort to reach a verdict, as it is desirable that there be a verdict in every case. Each of you should respect the opinions of your fellow jurors as you should have them respect yours, and in a spirit of tolerance and understanding endeavor to bring the deliberations of the whole jury to an agreement upon a verdict. Do not be afraid to change your opinion if the discussion persuades you that you should. But a juror should not agree to a verdict that violates the Instructions of the Court, not should a juror agree to a verdict of guilty unless he is convinced of the defendant's guilt beyond a reasonable doubt. I will ask you to go upstairs and continue to deliberate.

ECF No. 9-1 at 97. Approximately 40 minutes later, the jury returned its verdict of guilty.

**Direct Appeal**

On direct appeal, Petitioner raised the first three claims he now presents for federal habeas relief: that the trial court erred in admitting (1) Grave's and Stagge's testimony about gangs, (2) the photos of gang graffiti in the neighborhood of the shooting, and (3) evidence that Petitioner had previously shot McCanery, a crime for which Petitioner was never charged. As the appellate court noted, in his motion for a new trial, Plaintiff did not challenge the admission of Graves' testimony about gangs. The appellate court stated that Petitioner, therefore, had not preserved this particular point for appellate review. The court proceeded to consider the matter for plain error, and concluded that no "evident, obvious, and clear error" existed concerning the admission of this testimony. ECF No. 9-6 at 7.

The Court then considered whether the trial court erred in admitting Stagge's gang-related testimony and the photos of gang graffiti, matters that had been properly preserved for review. The court noted that generally, evidence of a defendant's affiliation

with a gang is improper character evidence, but here, Stagge's testimony and the photos were relevant to explain the State's theory that an ongoing dispute between the local Bloods and Crips gangs was Petitioner's motive for the shooting. The appellate court also believed that the gang-related evidence helped to establish Petitioner's identity as the shooter by corroborating McCanery and Wilson's testimony and by showing that Petitioner had a reason to shoot at them and Walker. Lastly, the court held that "any potential prejudice resulting from references to gang activity was minimal" because both the Sate and Petitioner introduced the gang issue to the venire panel before trial began, and any venireperson who indicated a tendency to presume guilt based on Petitioner's association with a gang was struck from the jury. *Id.* at 11. The Missouri Court of Appeals also rejected Petitioner's third point on appeal, holding that McCanery's testimony that Petitioner shot him approximately five months before Walker's murder was relevant to establishing the identity of Walker's murderer.

**State Postconviction Proceedings**

For state postconviction relief, Petitioner asserted the ineffective assistance of counsel claims that comprise Grounds (4) through (7) of his habeas petition, as set forth above.

Evidentiary Hearing

The motion court held an evidentiary hearing at which defense counsel, Gloria Johnson, Kesha Johnson, and Petitioner testified. Defense counsel testified that prior to this case, he had been a public defender for nine years and had been defense counsel in four first-degree murder cases. He testified that he decided not to present an alibi

defense because he thought the State's case was weak and Petitioner's alibi was "weak at best" and would distract the jury from the burden of proof, which was on the State. ECF No. 14-1 at 7. Instead, his trial strategy was to discredit McCanery who had changed his story as to who the shooter was, and who defense counsel believed was not a credible witness in general.

Defense counsel further testified that his investigator interviewed Kesha Johnson (Petitioner's girlfriend at the time of the murder) and Gloria Johnson (Kesha's mother). The interviews took place approximately six and one half months after Walker's murder. Counsel testified that the investigator's notes stated that Gloria told the investigator that Kesha and Petitioner picked Gloria up from work at about 4:30 or 5:00 on the evening in question, that they all went to the Burlington Coat Factory, and that after dropping Gloria off, Kesha and Petitioner spent the night at Gloria's sister's house. Counsel testified that the investigator's notes indicated that Gloria also told the investigator that while she was still at work, she heard breaking news that there had been a shooting in the Kingshighway area, and she called Kesha to let her know so that Kesha could take another route to pick Gloria up.

Counsel read from the investigator's notes that quoted Kesha as saying, "It's been a long time. I really can't remember." The notes further stated, "[Kesha] does, however, recall that she and [Petitioner] went to pick up her mother, Gloria Johnson, from work. Her mother told them that someone had been shot. [Kesha] really didn't have anything else to offer." *Id*. at 45.

Defense counsel testified that he did not speak to either potential alibi witness personally because it was not his practice to do so lest that would make him a witness in the case. He acknowledged that Petitioner told him he wanted an alibi defense, and wanted counsel to call Kesha and Gloria Johnson as witnesses, and that both were willing to testify at trial. But counsel decided not to call them, because in his view presenting them as alibi witnesses "was going to hurt and not help," *id*. at 17. He testified that he believed the alibi defense was weak. Kesha's story was vague and "all over the place," and would have easily been challenged on cross-examination. And Gloria's story was not credible, appeared inaccurate, and also would have been subject to challenge on cross-examination. Counsel believed injecting a weak alibi defense into the case would have diverted the jury's attention from the State's weak case, and risk a comparison of stories, which could cause the jury to lose sight that the State bore a significant burden. Counsel further testified that Petitioner's own alibi story conveyed to counsel was that he went with Kesha and Gloria to a store to buy junk food, with no mention of Burlington Coat Factory. Counsel reiterated that his trial strategy was to show that McCanery was not credible due to his inconsistent identifications, as "there was nothing else . . . to tie [Petitioner] to the shooting." *Id*. at 39-40.

When asked why he did not ask Petitioner on the stand where he was at the time of the murder, counsel explained that if Petitioner testified that he did not commit the crimes, and if he did not commit the crimes "and wasn't there, he would have no reason to know when it happened or – he knows he didn't shoot the guy. So obviously, he wasn't there. . . . it's like proving a negative. It's difficult to know where you were when

you weren't doing something." Defense counsel continued that if he asked Petitioner his whereabouts, it would have opened him up to "a whole bunch of cross-examination," which may have confused the issues, and taken the focus away from what little evidence the State had that showed Petitioner to be guilty. *Id.* at 18-19.

Counsel was then asked why he did not present photographic evidence that in June 2007 Petitioner did not have dreadlocks – evidence that would have discredited McCanery's testimony that one reason he did not identify Petitioner at first was because Petitioner had dreadlocks in June 2007, whereas as the person who shot Walker had short hair. Counsel testified that he did not recall Petitioner giving him a photograph or medical records showing that Petitioner had short hair June 2007. But counsel did remember talking about the hair-length issue with Petitioner and counsel acknowledged that he at least should have asked Petitioner on the stand about the length of his hair in June 2007, as that would have discredited McCanery's identification to some extent. *Id.* at 21-23.

Defense counsel testified that after the trial court rejected his request to send the videotape to the jury, he did not think to ask the court to ask the jury for clarification as to what they wanted to see. On cross-examination, defense counsel stressed that it was his trial strategy to rely on the weakness of the State's case, and that he believed presenting Kesha and Gloria Johnson as alibi witnesses would have hurt Petitioner's case.

Gloria Johnson testified at the evidentiary hearing that on the evening in question, Petitioner and Kesha picked her up from work in the Central West End at about 4:30 p.m. and from there they went to Burlington Coat Factory on South Kingshighway. About a

11

half hour before they picked her up, she called her daughter and told her she had heard on the news that there was a shooting on Kingshighway and Petitioner and her daughter should take a different route to pick her up. Gloria first said that she, Kesha, and Petitioner were at Burlington Coat Factory "for a minute," but then said they were there until about 6:00 or 7:00 p.m. She testified that Kesha and Petitioner then dropped her off at home close to 7:00 p.m., and that she did not know where they were headed afterwards, but then stated that they were going to the home of Gloria's sister. Gloria testified that she did not remember the date or day of the week of those events, and that Kesha picked her up from work every day, Monday through Friday, and a majority of the time Petitioner was with Kesha. Nor did Gloria she remember when she heard about Walker's murder or when she learned that Petitioner was arrested.

Kesha Johnson testified that she and Petitioner picked up her mother from work the evening of the murder, and the three of them went to Burlington Coat Factory. She testified that she did not know what they did after leaving the store, but then stated that after leaving the store and dropping her mother at home, she and Petitioner went to her aunt's house, but again stated, "I don't recall." *Id.* at 63. Kesha could not remember when Petitioner was arrested for the shooting, whether it was two days, two months, or one year after their trip to Burlington Coat Factory.

Petitioner testified that had defense counsel asked him on the stand where he was at the time of the murder, he would have testified that he was with Kesha and Gloria Johnson at Burlington Coat Factory. He testified that on the second day of trial, he showed defense counsel a photograph of himself taken in May 2007 at the hospital after

he had some surgery, in which he had a low-cut haircut.  He also told counsel that he had medical records showing that he was in the hospital in May 2007 when the photo was taken, and brought the photo and records with him to trial.   The photograph and records are part of the record before this Court.  Petitioner acknowledged on cross-examination that he changed the notation on the back of the photo, adding "07" to show the date it was taken.  He explained that he made this notation while he was in jail, awaiting trial on the charges in this case, in order to reflect what he was trying to say.  *Id*. at 77-78.

Decision Affirming the Denial of Post-Conviction Relief

In affirming the motion court's denial of post-conviction relief, the Missouri Court of Appeals first concluded that neither Gloria Johnson's nor Kesha Johnson's testimony would have provided a viable defense, and that consequently, defense counsel's decision to employ "other strategies" was reasonable.  The court reasoned that it could not be determined from the record whether the shooting on Kingshighway to which Gloria Johnson referred was the shooting in the underlying case or a different shooting, and that if it were the shooting involved in the underlying case, then Gloria's account of when Petitioner and Kesha picked her up from work and took her shopping "is drastically off, and cannot account for [Petitioner's] whereabouts at the time of the shooting."  The court determined that Kesha's "vague and inconsistent testimony would have neither unqualifiedly supported [Petitioner] nor provided him with an alibi.  Likewise, Gloria's inconsistent testimony and questionable account of time would have neither unqualifiedly supported the movant nor provided him with an alibi."  ECF No. 9-10 at 6-7.

The court noted that Petitioner did not tell counsel before trial that he was shopping at Burlington Coat Factory with Kesha and Gloria.  Rather, Petitioner told trial counsel a different story of his whereabouts, involving a trip to a store to buy junk food. Noting that the shooting of Walker occurred at about 6:45 p.m., the court reasoned that "Gloria, of course, could not account for [Petitioner's] whereabouts after he dropped her at home, either after being at Burlington Coat Factory for 'a minute' sometime after 4:30 or 'going on' 7:00."  *Id*. at 8.

The appellate court addressed the claim of failure to ask Petitioner at trial where he was at the time of the murder, as follows:

> Trial counsel reasoned that if the movant did not commit the crime, then obviously the movant was somewhere else when it happened. Trial counsel did not want to open the movant to cross-examination on his whereabouts, primarily because it might seem odd that the movant would specifically remember where he was when he did not do something. And trial counsel specifically expressed concern that such questioning could have distracted the jury from focusing on weaknesses in the State's case.  Under the circumstances, trial counsel's strategic decision was reasonable.

*Id*. at 8.

The Missouri Court of Appeals next rejected Petitioner's claim that had defense counsel presented photographic evidence to establish that Petitioner did not have dreadlocks in June 2007, it would have shown that McCanery identified the wrong person as the shooter both in June 2007 and in the present case.  The court concluded: "To prevail on his claim, [Petitioner] must demonstrate that a reasonably competent attorney would submit evidence that the defendant had obviously altered and produced in the

middle of trial.  We reject such a proposition, and will not deem trial counsel ineffective."
*Id*. at 9-10.

Petitioner's claim that counsel was ineffective for failing to request the trial court to ask the jury for clarification about the evidence it wanted to see when it asked for McCanery's deposition and a transcript of Graves fared no better.  The appellate court concluded that defense counsel had no basis to request a clarification when the jury "stated quite plainly" what it wished to see.  *Id*. at 11.  Lastly, the appellate court concluded that in the circumstances of Petitioner's trial, giving the hammer instruction was not improper, and that defense counsel was, therefore, not ineffective for failing to move for a mistrial after the jury told the court that the jury had reached an impasse.

**Federal Habeas Petition**

As noted above, Petitioner raises eight claims for habeas relief, three claims of trial court error that deprived him of a fair trial (admitting police testimony regarding gang activity in the area of the crimes; admitting photo exhibits showing gang graffiti in the area; and admitting McCanery's testimony that he recognized Petitioner because Petitioner had shot him in June 2007); and five claims of ineffective assistance of defense counsel (failing to call Kesha and Gloria Johnson as alibi witnesses, failing to ask Petitioner at trial where he was at the time of the murder, failing to introduce evidence showing that in June 2007 Petitioner did not have dreadlocks, failing to request clarification as to what evidence the jury asked to see during deliberations, and failing to ask for a mistrial when the jury indicated it had reached an impasse).

# DISCUSSION

## Standard of Review

Federal habeas relief is available to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Where a claim has been adjudicated on the merits in state court, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that application for a writ of habeas corpus cannot be granted unless the state court's adjudication:

1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

A state court "unreasonably applies" clearly established federal law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "[A] determination of a factual issue made by a State court shall be presumed to be correct," 28 U.S.C. § 2254(e)(1), and the petitioner has the burden of rebutting this presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). A habeas petitioner meets the demanding standard for relief "only when he shows that the state court's decision was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility

for fairminded disagreement." *Dunn v. Madison*, 138 S. Ct. 9, 11 (2017) (citation omitted).

**Claims of Trial Court Error**

The Court first concludes that the state appellate court reasonably held that admission of gang-related evidence was not error. "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States," and it is not within "the province of a federal habeas court to reexamine state-court determinations on state-law questions," such as the admissibility of evidence at trial. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (citations omitted); *see also Bucklew v. Luebbers*, 436 F.3d 1010, 1018 (8th Cir. 2006). "A federal issue is raised only where trial errors infringe on a specific constitutional protection or are so prejudicial as to amount to a denial of due process." *Bucklew*, 436 F.3d at 1018. A habeas petitioner must show that alleged errors in the admission of evidence rendered the trial fundamentally unfair, such that there is reasonable probability that error affected the outcome of trial. *Carter v. Armontrout*, 929 F.2d 1294, 1296 (8th Cir. 1991).

Here, as the state appellate court held, the prosecution's theory was that the crimes were gang related, and the gang-related evidence was relevant to prove motive and identification. *See, e.g., Melvin v. Sec'y, Dep't of Corr.*, No. 8:13-CV-1201-T-23AEP, 2016 WL 6166914, at *13 (M.D. Fla. Oct. 24, 2016) ("Evidence of gang affiliation is admissible when it is relevant to show motive . . . ."). It might have been better had the trial court limited the extent of the gang evidence presented by Stagge, but this Court

concludes that, in light of the evidence of guilt against Petitioner, the evidentiary errors alleged were not so prejudicial as to amount to a denial of due process.

Similarly, the Court rejects Petitioner's third ground for federal habeas relief – that Petitioner was unfairly prejudiced by the admission of McCanery's testimony that he recognized Petitioner at the time of the murder, in part, because Petitioner had shot him in June 2007. The Court cannot say that the Missouri Court of Appeals' adjudication of this claim was factually or legally unreasonable based on the evidence at trial. Evidence concerning the June 2007 shooting was fairly limited in the context of the whole trial, was relevant to the question of identification, as well as motive, and was, thus, not merely improper propensity evidence.

## Claims of Ineffective Assistance of Defense Counsel

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To show ineffective assistance of counsel, a habeas petitioner must show both that "[his] counsel's performance was deficient" and that "the deficient performance prejudiced [his] defense." *Strickland*, 466 U.S. at 687. Counsel is presumed competent, and decisions based on a reasonable trial strategy do not demonstrate incompetence. *Id*. at 689-91. "*Strickland*'s first prong sets a high bar. A defense lawyer navigating a criminal proceeding faces any number of choices about how best to make a client's case. The lawyer has discharged his constitutional responsibility so long as his decisions fall within the 'wide range of professionally competent assistance.'" *Buck v. Davis*, 137 S. Ct. 759, 775 (2017) (quoting *Strickland*, 466 U.S. at 690).

To show prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Booth v. Kelley*, ___ F.3d ___, 2018 WL 987740, at *2 (Feb. 21, 2018).

When an ineffective assistance claim has been addressed by the state court, this Court must bear in mind that "[t]aken together, AEDPA and *Strickland* establish a 'doubly deferential standard' of review." *See Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012) (citation omitted). In the context of a habeas claim, it is not sufficient for a petitioner to "show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance." *Bell v. Cone*, 535 U.S. 685, 698-99 (2005). "Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Id.* at 699.

Here, this Court's careful review of the record convinces the Court that the state appellate court's adjudication of Petitioner's claims of ineffective assistance of defense counsel did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law or that was based on an unreasonable determination of the facts in light of the evidence presented at trial and the postconviction hearing. The state court reasonably found that defense counsel's failure to call Kesha and/or Gloria Johnson as alibi witnesses was reasonable trial strategy in light of their vague and inconsistent statements to defense counsel's investigator. The Court further notes that their statements were inconsistent with Petitioner's alibi story that he conveyed

to defense counsel. *See Haidul v. Steele*, No. 4:14-CV-817-SPM, 2017 WL 4310264, at *4 (E.D. Mo. Sept. 28, 2017) (finding that it was not unreasonable trial strategy for defense counsel not to call an individual as an alibi witness where counsel's notes indicated the individual could not recall with certainly what day he had lunch with the petitioner).

In considering the value of the testimony of uncalled witnesses in an ineffective assistance claim, the Eighth Circuit has stated a habeas court should consider "(1) the credibility of all witnesses, including the likely impeachment of the uncalled defense witnesses; (2) the interplay of the uncalled witnesses with the actual defense witnesses called; and (3) the strength of the evidence actually presented by the prosecution." *Armstrong v. Kenna*, 590 F.3d 592, 596 (8th Cir. 2010). Applying these standards here, the state court's determination cannot be faulted. *See, e.g., Crayton v. Steele*, No. 4:14-CV-1038 (CEJ), 2017 WL 1355484, at *10 (E.D. Mo. Apr. 13, 2017).

With respect to the failure to ask Petitioner where he was at the time, the Court is not persuaded by defense counsel's reasoning that asking Petitioner where he was at the time of the murder would have been like trying to prove a negative. Such logic would support not asking any criminal defendant where he was at the time of the charged crime, even if alibi evidence were strong. Another reason given by defense counsel for not asking Petitioner the question at issue – that it would have distracted the jury from focusing on the weakness of the State's case – was based on defense counsel's belief that McCanery's identification of Petitioner as the person who shot Walker was weak in light

20

of McCanery's changing stories. While also problematic,[2] the Court cannot say that the state court's finding that defense counsel made a reasonable strategic decision on this matter was objectively unreasonable, especially coupled with defense counsel's testimony that he did not ask Petitioner his whereabouts at the time of the murder because this would have opened Petitioner up to harmful cross-examination.

Having found that defense counsel's strategy was reasonable, the state court did not consider the second prong of the *Strickland* analysis. This Court now concludes that the second prong also is not satisfied, that is, the Court concludes that that there is no reasonable probability that, but for counsel's presumed unprofessional error, the result of the trial would have been different. *See Haidul*, 2017 WL 4310264, at *4;

With respect to the photograph showing Petitioner with short hair in May 2007, Defense counsel testified at the post-conviction hearing that he did not recall seeing such photographic evidence. There is no indication that the photo was not from May 2007. However, where, as here, Plaintiff presented the photograph mid-trial, and admitted at the evidentiary hearing that he had altered the date on the back of the photo, something that was evident to the State's counsel at the evidentiary hearing, the Court cannot say that the state appellate was unreasonable in its determination that Petitioner failed to show that a reasonably competent defense attorney would have introduced the photo.

And even if Defense counsel's performance on this matter was below standard, the

---

[2] Counsel does not appear to have taken into account Detective Graves' testimony that Wilson also identified Petitioner as the person who shot and murdered Walker. Thus, this was arguably a case of not one eyewitness identifying a defendant, but of two eye witnesses doing so. But the Court notes that at trial, Wilson denied making this statement to Graves, and testified that he could not identify the shooter.

Court concludes that had the jury heard evidence (either photographic or testimonial) that Petitioner did not have dreadlocks in June 2007, there does not exist a reasonable probability that the result of the trial would have been different. McCanery testified that prior to the murder, he had known Petitioner for about seven years. Thus, McCanery's possible misidentification of Petitioner as the person who shot him in June 2007 was not critical to the State's identification evidence. While the hair-length evidence might have been helpful to Petitioner's case, the absence of this evidence does not undermine the Court's confidence in the verdict.

The Court finds that the Missouri Court of Appeals based its rejection of Petitioner's last two claims of ineffective assistance of defense counsel on the correct legal principles and on a fair reading of the record. There is nothing in the record to suggest that the jury was not in fact seeking the deposition of McCanery that had been discussed in cross-examination. Further, it seems clear that a request by defense counsel to ask the jury for clarification would have been rejected by the trial court, given the trial court's stated belief that the terms of the jury's request were clear. Additionally, even if defense counsel asked the court to ask the jury for clarification, the court granted the motion, and the jury then asked for McCanery's videotaped statement, the Court cannot say that the result of the trial would have been different. The Court does not believe that habeas relief can be predicated on these multiple degrees of speculation.

With regard to Petitioner's last claim, the Court first notes that Respondent treats it as a claim of trial court error, and argues that the claim was procedurally defaulted because Petitioner did not raise it on direct appeal. A fair reading of the habeas petition,

however, shows that Petitioner is primarily claiming that defense counsel was ineffective in failing to ask for a mistrial after the jury conveyed its impasse to the trial court and the trial court gave the hammer instruction. Considering both aspects of the claim – denial of due process due to trial court error, and ineffective assistance – the claim fails.

The Supreme Court has recognized that "[a]ny criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988). To determine whether a trial court improperly coerced the jury, a court "consider[s] the supplemental charge given by the trial court in its context and under all the circumstances." *Id*. at 237 (citation omitted). Due to the fact-intensive nature of the inquiry into jury coercion, federal habeas review is particularly deferential to the findings of the state court. *Early v. Packer*, 537 U.S. 3, 11 (2002); *see also Stallings v. Delo*, 117 F.3d 378, 381 (8th Cir. 1997) (stating that a state court's factual finding that jury coercion did not occur is entitled to a presumption of correctness). Here the state appellate court considered the totality of the circumstances and reasonably concluded that the trial court's instruction was proper and not coercive. And the appellate court's corollary conclusion that defense counsel's failure to ask for a mistrial is also objectively reasonable.

## CONCLUSION

In this case the evidence of guilt is not overwhelming. Furthermore, the jury initially could not reach a guilty verdict. Nevertheless, for the reasons stated above, the Court does not believe that Petitioner is entitled to federal habeas relief. The Court also does not believe that reasonable jurists might find the Court's assessment of the issues

presented in this case debatable or wrong, for purposes of issuing a Certificate of Appealability under 28 U.S.C. § 2254(d)(2). *See Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (standard for issuing a Certificate of Appealability) (citing *Miller–El v. Cockrell*, 537 U.S. 322, 336 (2003)).

Accordingly,

**IT IS HEREBY ORDERED** that the petition of Julius Smith for a writ of habeas corpus relief is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability shall not be issued.

A separate Judgment shall accompany this Memorandum and Order.

AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 8th day of March, 2018.